1                    IN THE UNITED STATES DISTRICT COURT
                             DISTRICT OF KANSAS
2

3    THE UNITED STATES OF AMERICA,

4                 Plaintiff,

5          vs.                           District Court
                                         Case Number
6    RYAN LOWMASTER,                     14-10144

7                 Defendant.

8

9                    TRANSCRIPT OF PROCEEDINGS

10

         On the 30th day of May, 2018 at 3:37 p.m. came on
11   to be heard in the PRELIMINARY HEARING and MOTION FOR
     DETENTION in the above-entitled and numbered cause before
12   the GWYNNE E. BIRZER, Magistrate Judge of the United
     States District Court for the District of Kansas, Sitting
13   in Wichita.
              Proceedings electronically recorded.
14            Transcript produced by computer.

15

16   APPEARANCES

17            The Plaintiff appeared by and through:
              Mr. Jason Hart
18            United States Attorney's Office
              301 N. Main, Suite 1200
19            Wichita, Kansas 67202

20            The Defendant appeared in person, by and through:
              Mr. Timothy Henry
21            Federal Public Defender's Office
              301 N. Main
22            Suite 850
              Wichita, KS 67202

23

24

25

I N D E X

PAGE

**WITNESSES**

    For the Plaintiff

    JAMES DALE HUNTER

     Direct Examination By Mr. Hart      6

     Cross Examination By Mr. Henry    15

     Redirect Examination By Mr. Hart   27

    JIMMY HOLTS

     Cross Examination By Mr. Henry    38

    For the Defendant

     Direct Examination By Mr. Hart    28

**REPORTER'S CERTIFICATE**    67

1           (The following proceedings commenced at 3:37 p.m.,

2           were electronically recorded and have been

3           requested transcribed:)

4           THE COURT:  Let's take up Mr. Lowmaster's matter.

5           We call the matter of United States versus Ryan

6   Lowmaster, Case Number 14-10144-01.

7           Let's go ahead and get appearances on the record,

8   please.

9           MR. HART:  Thank you.  Government appears by and

10  through Jason Hart, Assistant U.S. Attorney.

11          THE COURT:  Okay.

12          MR. HENRY:  Defendant appears in person, through

13  Timothy Henry, Assistant Federal Public Defender.

14          THE COURT:  All right.  Counsel, we are here for a

15  detention hearing and preliminary hearing on a supervised

16  release violation.

17          I think we started to have the hearing and then

18  there was some issue with regard to whether or not the

19  court could make the finding in the interest of justice

20  or the interest of convenience and the like, in terms of

21  who needed to -- who needed to be present so just so that

22  you know what I've reviewed, I reviewed felony warrant

23  from Oklahoma, I've reviewed the petition for violation,

24  I've reviewed the violation report, I have reviewed

25  Federal Rule 1101(d)(3), 32.1, I reviewed the *Jones* case,

1  and *U.S. v. Henry.*

2      Anything else you think I should review in order

3  to be familiar with this situation?

4      Mr. Hart?

5      MR. HART:  No, Your Honor.  I think where we -- I

6  think where we left off, and the court did something

7  earlier today that clarified a procedural issue for me,

8  is the court actually conducted the detention hearing

9  before the preliminary hearing to determine whether or

10 not a preliminary hearing was necessary and we actually

11 the last time around sort of reversed those.

12      THE COURT:  We did.

13      MR. HART:  And but because the nature of the

14 violation report is such that it relates to new crimes, I

15 don't have a problem with proceeding directly to the

16 preliminary hearing, which I think would factor into the

17 Court's consideration of the detention issue, and I note

18 that we're about an hour and 20 minutes from 5:00 o'clock

19 and I have the witnesses.

20      THE COURT:  Okay.

21      MR. HART:  Investigator Dale Hunter and Chief --

22 Cherryvale Chief of Police, Jimmy Holton are present.

23      THE COURT:  Okay.

24      MR. HART:  And they have testimony related to the

25 two different investigations of -- that are the subject

1  of the petition and amended petition that has been filed

2  by Ms. Busenbark who we heard very briefly from last

3  time.

4        THE COURT:  Okay.

5        MR. HART:  I don't know if the defense would like

6  to be heard first on the issue of detention since it's

7  their burden at a supervised release violation but if the

8  Court would prefer we just proceed to the preliminary

9  hearing, I'm fine with that.

10        THE COURT:  Have you folks talked about -- I'm

11  comfortable proceeding either way.  I know there was a

12  preference the last time that we were before the court

13  to -- to do it the flip way and proceed with the

14  preliminary hearing first but --

15        MR. HENRY:  I would ask for that, Your Honor.

16        THE COURT:  Okay.

17        MR. HENRY:  I think it advises the Court of I

18  think a little bit more of the underlying facts of the

19  case and whether or not release should be granted.

20        THE COURT:  Okay.

21        MR. HART:  With that in mind, Your Honor, we call

22  Investigator Dale Hunter.

23        THE COURT:  Okay.

24        MR. HART:  Step up to Ms. Merseal, first, and then

25  come back to the stand.

1        MS. MERSEAL:  Do you prefer to swear or affirm?

2        Okay.  If you'll raise your right hand.

3        Do you swear the testimony you are about to give

4  in the hearing -- in the case now in hearing will be the

5  truth, the whole truth and nothing but the truth, so help

6  you God?

7        THE WITNESS:  I do.

8        MS. MERSEAL:  Thank you.

9        Please have a seat in the witness stand.

10        MR. HART:  And, Your Honor, just to orient the

11  Court and counsel to where my witness presentation will

12  begin, this witness will address the issues that relate

13  to the amendment to the petition which began I think on

14  Page 5 and 6 of the Amended Petition For Warrant Or

15  Summons For Offender on Supervision.

16        THE COURT:  I'm there.

17        Mr. Henry, you there?

18        MR. HENRY:  Yes, I am.

19        THE COURT:  Okay.  All right.

20                    JAMES DALE HUNTER,

21  called as a witness on behalf of the Plaintiff, having

22  been first duly sworn, testified as follows:

23                    DIRECT EXAMINATION

24  BY MR. HART:

25  Q.    Good afternoon, sir.  Would you please introduce

1  yourself to the court.

2  A.    My name's James Dale Hunter, I'm an investigator

3  with the Osage County Sheriff's Office in Oklahoma.

4  Q.    And, sir, did you have an occasion to come to be

5  investigating a burglary and motorcycle theft reported by

6  Eddy Verdin of Pawhuska, Oklahoma?

7  A.    Yes, I did.

8  Q.    And just briefly, how do you know Mr. Verdin?

9  A.    I've worked with Mr. Verdin personally for about

10  12 years.  He is the current and sitting Sheriff of Osage

11  County, Oklahoma.

12  Q.    Now, what was the theft that Mr. Verdin reported?

13  A.    Mr. Verdin manages a ranch also that he's part

14  owner in.  They maintain a headquarters south of his

15  residence about three miles.  At that headquarters they

16  have barns and cattle chutes and things of that nature

17  and in one of the barns they had some equipment,

18  particularly a four-wheeler and a utility trailer stored.

19  Q.    Now, that particular four-wheeler and trailer, was

20  that stored at the ranch property there in Osage County,

21  Oklahoma?

22  A.    It was.

23  Q.    And did Mr. Verdin report at some time between

24  December 4th of 2017 and December 5th of 2017 that

25  property went missing?

1  A.      He did.

2  Q.      Now, when he contacts you had Mr. Verdin undertook

3  any investigation on his own?

4  A.      He had.

5  Q.      And can you explain whether or not he was able to

6  identify a potential suspect?

7  A.      He was.  Mr. Verdin was a former narcotics officer

8  in the area, maintained a network of informants, he asked

9  if any had seen similar items or saw anyone selling items

10 like he had missing.  One of them sent him a phone text,

11 picture of the -- his particular items which were unique

12 enough he could identify from the photograph, and told

13 him where he might find them.

14 Q.      And was that location where he might find them in

15 Caney, Kansas?

16 A.      It was.

17 Q.      And is that the residence of a Rick Fontes?

18 A.      Yes, it was.

19 Q.      And that's spelled F-o-n-t-e-s.

20 A.      Yes.

21 Q.      Now, with that information in hand, a place where

22 you can go look for it, and an individual that you might

23 ask questions of, did you proceed to go out to that

24 residence to make inquiry?

25 A.      Yes, I did.

Q.      And what did you find once you got there?

A.      I met with Mr. Fontes, I asked him if he had had

the items.  He stated he had had them and had sold them.

He stated that Mr. Ryan Lowmaster had brought them to his

home and that he had then arranged for a buyer to come to

the home, or to his shop --I apologize, he had a shop a

few blocks away from his home in the town of Caney -- he

arranged for Mr. Lowmaster to meet a man named Harold

Gunn at the shop and for Mr. Lowmaster to sell him the

trailer and four-wheeler.

Q.      Did you later meet with Mr. Gunn at his residence

in Oklahoma?

A.      I did not, no.

Q.      Did other investigators meet with Mr. Gunn,

though?

A.      Yes, they did.

Q.      And at that point in time, to your knowledge did

they find the trailer and four-wheeler that were

Mr. Virden's stolen property?

A.      They did, Washington County Sheriff's office

recovered those same items and they were positively

identified again by Mr. Verdin.

Q.      Now, as far as Mr. Gunn went, did you have

occasion to speak with him or did you have other law

enforcement officers do that?

A.      I spoke with him via telephone.

Q.      And what did he tell you as far as how he came to

be in possession of the trailer and the four-wheeler?

A.      He said Mr. Rick Fontes sent him a picture,

believe it's going to be the same picture, according to

picture that Mr. Verdin had received, and asked if he was

interested in the items.  He said he had driven to

Mr. Fontes' shop in Caney and was introduced to

Mr. Lowmaster.

He did also identify a photograph of Mr. Lowmaster

later identifying him as the person he purchased the

stolen items from.  Mr. Lowmaster stated he had fallen on

some hard times and needed to sell a couple of items and

he had agreed to buy the items for I believe $2,000.

Q.      And the purchase was then made there in Caney,

Kansas?

A.      That's correct.

Q.      So just so we're clear, we have property that is

taken from -- stolen from a residence in Oklahoma, which

was then moved across state lines into Kansas where it

was then sold and then transported back across state

lines into Oklahoma?

A.      That's correct .

Q.      Now, as far as Mr. Gunn goes, were you able to

overhear a conversation between Mr. Fontes and Mr. Gunn

1 relative to that property?

2 A.     I was.

3 Q.     And as far as the tone of that conversation, did

4 that give you an indication as to whether Mr. Gunn knew

5 that the property was stolen at the time?

6 A.     It indicated that he did not know,

7 Mr. Fontes -- he called Mr. Fontes and was wanting to

8 inquire as to whether those items -- basically confirmed

9 whether they were stolen or not and that conversation

10 started, I interrupted and began speaking to Mr. Gunn.

11 Q.     All right.  And it's at that point you actually

12 learned -- have the opportunity to interview Mr. Gunn?

13 A.     At that point I spoke to him briefly, then I

14 called him a couple days later.

15 Q.     Okay.  As far as Mr. Fontes goes, speaking of his

16 telephone, did you have an opportunity to look at

17 anything on his phone to indicate where the property came

18 from?

19 A.     Yes, I did.  He showed me text messages.

20 Mr. Fontes was alleging innocence, that he didn't know

21 anything about this and it was all Mr. Lowmaster's doing.

22      I asked him if he had any messages between him and

23 Mr. Lowmaster.  He said he did, unlocked his phone and

24 opened some messages and he allowed me to freely look

25 through the messages.  Went back several days, I don't

1  recall the exact date, you can see communication between

2  them where Mr. Lowmaster indicated he had those items and

3  asked Mr. Fontes to arrange a purchaser.

4  Q.      Now, subsequent to this interaction, finding the

5  property, talking with Mr. Fontes, looking at his phone,

6  did you have occasion to conduct a mirandized interview

7  of Mr. Lowmaster?

8  A.      Yes, I did.

9  Q.      And was that in Montgomery County?

10 A.      It was in Montgomery County at the sheriff's

11 office.

12 Q.      All right.  And to be clear, had they learned of

13 your investigation and authorized you to come up and

14 conduct an interview up there?

15 A.      They had.

16 Q.      As far as that interview goes, what did

17 Mr. Lowmaster tell you as far as his involvement with the

18 trailer and the four-wheeler which were later sold to

19 Mr. Gunn?

20 A.      He stated he had driven up past Mr. Virden's

21 ranch, seen the barn that the items were taken from, he

22 had returned later that evening with Mr. Fontes, went

23 into the barn, he said he moved a side-by-side ATV out of

24 the way so Mr. Fontes could load the four-wheeler onto

25 the trailer and then hooked up the vacant trailer onto

1 his pickup and drove away.

2     He said he did wreck his pickup into the ditch or

3 something just down the road away from the ranch

4 headquarters while fleeing and they did take them over to

5 Caney, Kansas where he sold them to Mr. Gunn.

6 Q.    Now as far as that entering of Mr. Virden's

7 property, is that a crime now in Oklahoma?

8 A.    It is.

9 Q.    Is that a violation of Title 21 of Oklahoma

10 Statute, Section 1435?

11 A.    Yes, it is.

12 Q.    And as far as the taking of the ATV, the motor

13 vehicle, is that also a violation of Title 47 of Oklahoma

14 Statute, Section 4-102?

15 A.    It is.

16 Q.    And have you presented charges to a judge down

17 there in Oklahoma?

18 A.    Yes, I have.

19 Q.    And sworn out a probable cause affidavit?

20 A.    Yes, I have.

21 Q.    And does that probable cause affidavit essentially

22 contain facts as you've relayed them to us today?

23 A.    Yes, it does.

24 Q.    And fair to say you probably went into a little

25 bit more detail here but it's basically the same

1  substance?

2  A.      That's correct.

3  Q.      Do you know, did the judge issue a warrant for

4  Mr. Lowmaster's arrest?

5  A.      The judge did issue a warrant.

6  Q.      All right.  Have you effectuated that yet?

7  A.      Not yet.

8  Q.      All right.  As far as the items that were missing,

9  you indicated there was a four-by-four, is that actually

10 a Honda Fourtrax Rancher four-by-four?

11 A.      Yes, it is.

12 Q.      And then the flatbed trailer, is that a Millertime

13 Manufacturing 12-foot flatbed trailer?

14 A.      Yes, it is.

15 Q.      As far as the date when these were taken, did you

16 establish that it was roughly between December 4th and

17 December 5th of 2017 when the items were taken?

18 A.      Yes, I did.

19 Q.      All right.  And to be clear, you indicated that

20 Mr. Gunn identified Mr. Lowmaster.  Did he actually

21 provide you that name?

22 A.      That's -- when I asked him if he knew Mr. Ryan

23 Lowmaster, he said that was the name either Fontes had

24 given him or Mr. Lowmaster had introduced himself as that

25 name.  I do not recall which it was.

1  Q.    All right.  But as far as the name goes, they were

2  familiar with the name but he also identified a picture

3  of Mr. Lowmaster?

4  A.    That's correct.

5  Q.    Is the individual sitting right over here the same

6  one as what Mr. Gunn identified?

7  A.    He is.

8  Q.    And is that same individual you interviewed down

9  in Montgomery County?

10 A.    Yes, it is.

11 Q.    All right.

12       Thank you, sir, I don't have any further questions

13 for you.  Defense counsel might.

14                    CROSS EXAMINATION

15 BY MR. HENRY:

16 Q.    Deputy Hunter, maybe I was -- I wasn't hearing

17 correctly.  Were you saying Brian Lowmaster?

18 A.    Ryan.

19 Q.    Ryan.  Okay.  And the communications that you had

20 with Mr. Gunn, can you tell me, first of all, on the

21 phone call that you -- when you were with Mr. Fontes in

22 Kansas, what -- what conversations did Mr. Gunn tell you

23 at that point in time?

24 A.    He said he had -- he had the items, he'd gotten

25 them from Mr. Lowmaster by an arrangement with

1  Mr. Fontes.

2  Q.     Did he say that he had paid Mr. Lowmaster the

3  money or did he say he paid Mr. Fontes the money?

4  A.     He -- if I recall correctly, he stated

5  Mr. Lowmaster handed him the money.  Took -- handed the

6  money to Mr. Lowmaster.

7  Q.     Okay.  But it was Mr. Fontes that had set up the

8  sale?

9  A.     Mr. Fontes simply contacted Mr. Gunn, asked him if

10  he was interested in these items, and then had Mr. Gunn

11  drive to the shop to meet Mr. Lowmaster.

12  Q.     Is Mr. Gunn known to have a previous relationship

13  with my client?

14  A.     I have no idea.

15  Q.     Okay.  But apparently he has a relationship with

16  Mr. Fontes, is that correct?

17  A.     That's correct.

18  Q.     And has Mr. Gunn admitted to buying other property

19  from Mr. Fontes?

20  A.     I -- not to my knowledge, no.

21  Q.     Did Mr. Fontes say, Come on over and get the

22  stuff?

23        Excuse me, did Mr. Gunn, when you talked to him

24  say that, Come on over and get the -- the materials?

25  A.     At that point there were already officers there

1  taking them so he didn't really have an opportunity to

2  make that statement, no.

3  Q.     Okay.  The -- did you take and keep the phone of

4  Mr. Fontes?

5  A.     No, I did not.

6  Q.     Did you take any screenshots of the messages that

7  you have testified here today?

8  A.     No, I did not.

9  Q.     Where are those -- where is that evidence, I

10 guess, that you're testifying to?

11 A.     Which one?  The screenshots or the phone?

12 Q.     Well, the -- the phone of Mr. Fontes.

13 A.     To my knowledge, Montgomery County Sheriff's

14 Office or Caney Police Department has it.

15 Q.     Okay.  Now, you ended up going through -- how far

16 back did you go on those texts?

17 A.     I just went a couple days there to -- to the 4th,

18 5th, something like that, 6th, in that area.  Again at

19 the time, Mr. Fontes is showing it to me, at that time

20 he's not detained but he's -- there's stolen property

21 being revealed and things, I didn't want to conduct any

22 further searches with any questions of custody.

23 Q.     Okay.  Now, were the -- were the messages that you

24 saw, were those messages that were for Mr. Fontes to

25 Mr. Gunn and back and forth between those two, or did

1  they also include messages from Mr. Fontes and

2  Mr. Lowmaster?

3  A.     I believe they were between these two, Mr. Fontes

4  and Mr. Lowmaster.  Mr. Gunn's messages, I don't

5  believe -- I don't believe I remember seeing any of

6  those.  I believe I had been under the impression they

7  spoke by phone, not text.

8  Q.     So and then your -- so you don't recall much of

9  any of the conversation that you had with Mr. Gunn at

10 that time over the phone?

11 A.     I -- I -- I recall it was very short, I explained

12 to him that I was present with Mr. Fontes and that

13 Mr. Fontes might be in some trouble and asked him where

14 he had bought the items then really quick and

15 he -- something occurred, I don't recall what happened or

16 what, I have it recorded so we can review that at some

17 point and see.

18 Q.     Okay.  And the -- you later then interviewed

19 Mr. Gunn a couple days later, correct?

20 A.     That's correct.

21 Q.     And that was a more thorough interview, is that

22 correct?

23 A.     As much as it could be, he was -- drives on the

24 road, doing short haul deliveries, he was out of state at

25 the time, that's why he had to talk to me by phone, he

1  was losing service but I got maybe a four or five-minute

2  conversation in with him.

3  Q.      Okay.  So it wasn't face-to-face?

4  A.      No, sir.

5  Q.      What did he tell you then?

6  A.      Just stated that he had been contacted by

7  Mr. Fontes asking if he was interested in, I believe it

8  was a generator, the stolen four-wheeler from my

9  jurisdiction and the trailer from my jurisdiction

10 belonging to Mr. Verdin.  He said he reviewed a

11 photograph, thought he might want them, him and his

12 son-in-law then drove to Caney, Kansas, to Mr. Fontes'

13 shop and Mr. Fontes introduced him to Mr. Lowmaster, they

14 worked out a deal and Mr. Lowmaster took the money and

15 Mr. Gunn took the items.

16 Q.      Did you see any money pass through Mr. Fontes'

17 hands?

18 A.      He did not say and not to my knowledge.

19 Q.      Okay.  And did he say who his son-in-law was?

20 A.      Yes.

21 Q.      What's his name?

22 A.      Last name is Calcoat, I do not remember his first

23 name, sir.  BJ possibly.

24 Q.      C-a-l-c-o-a-t?

25 A.      Yes.

Q.      Now you had a conversation with Mr. Fontes before

Mr. Gunn was called, is that right?

A.      That's correct.

Q.      What did Mr. Fontes have to say?

A.      Mr. Fontes was downplaying his own involvement in

the entire matter.  He presented a picture that he's just

a poor fellow trying to get a shop started and that

Mr. Lowmaster has been bringing stolen property to him

and he's been trying to help get rid of it just to get it

away from his place.

Q.      Now are you aware of any criminal offenses that

Mr. Fontes has made in the state of Oklahoma?

A.      The only one I've heard alleged is what

Mr. Lowmaster stated, that Mr. Fontes assisted him in

burglarizing the Bar J Ranch that Sheriff Verdin runs.

Q.      But you are aware Mr. Fontes has a criminal

history?

A.      Yes.

Q.      And you weren't believing that he was downplaying

everything and trying to put it on my client, did you?

A.      No.

Q.      The -- do you know how long his shop has been

there?

A.      No, I do not.

Q.      But you said that he tried just saying that he is

1  just trying to get his shop started, is that correct?

2  A.      That is what he stated, yes.

3  Q.      So that would then imply to you he's just trying

4  to get the business up and running?

5  A.      I -- I took it to mean sometime in the last few

6  months he started that.

7  Q.      Okay.  So if his shop had been there for awhile,

8  that would also be deceptive to Mr. Fontes' part?

9  A.      That's correct.

10 Q.      The -- with regards to the -- Mr. Virden's

11 property, you said this was the Johnson Ranch, is that

12 right?

13 A.      It's the Bar J Ranch.

14 Q.      Bar J, I'm sorry.

15         I don't know where I got that.  Is that in any of

16 your reports or --

17 A.      It's possible.  It's got a name.  The name on the

18 sign is Bar J.  I -- something -- maybe it's the Johnston

19 Limited Liability Company that runs that, the public name

20 is Bar J Ranch, that's what you see on signs.

21 Q.      Okay.  So John Stone is the company that

22 essentially oversees the ranch or owns the ranch and that

23 company is partially owned by Sheriff Verdin?

24 A.      That's correct, there's a partnership between him

25 and Mr. John Stone to run this corporation.

1  Q.      Okay.  So when I heard "Johnson," I'm assuming I

2  heard John Stone then, is that correct?

3  A.      That's correct.

4  Q.      Okay.  Thank you.

5          Was there any evidence found at the scene of that

6  theft that you can remember?

7  A.      I didn't personally respond to the scene.  The

8  officer that did respond noted a cut lock in his report.

9  Q.      Okay.  And was there any other items that were

10 reported stolen?

11 A.      There was one logging chain, I believe 10- or

12 20-foot logging chain, I don't recall.  The sheriff of

13 course didn't have any particularity for that so we

14 didn't have much of a way to look for that, didn't have

15 any markings or serial numbers or things of that nature,

16 it looked like there's a residence at the place as well,

17 it's not currently occupied, it appeared to have been

18 entered and somebody went through it but no items were

19 missing from that home.

20 Q.      Okay.  And the logging chain, did it ever come up

21 on Mr. Fontes' advertisements for selling property?

22 A.      No, it did not.

23 Q.      Was there any kind of items, for example,

24 regarding smoking?  That were found at the scene in

25 Oklahoma?

1 A.     I believe there was a cigarette butt recovered, I

2 do not know anything of whether it was tested or any

3 results were --

4 Q.     Okay.  But it was taken as evidence, is that

5 right?

6 A.     I believe that's correct, yes.

7 Q.     And there is -- so it's still able to be tested

8 for DNA if -- if it's still in your custody?

9 A.     If that exists, again, I did not respond to the

10 initial scene at the time so I believe I remember seeing

11 that in the report but I personally -- don't have

12 personal knowledge that there is a cigarette butt but I

13 believe that is correct.

14 Q.     And then there was also a lighter found there?

15      MR. HART:  Your Honor, if it will speed up

16 proceedings I will stipulate that there was a lighter and

17 cigarette filter that were bagged for evidence by Deputy

18 Casey Witt of the Osage County Sheriff's Office.

19      THE COURT:  Do you accept that stipulation,

20 Mr. Henry?

21      MR. HENRY:  Yes, I do.

22 BY MR. HENRY:

23 Q.     Do you happen to know whether or not the lighter

24 was submitted for any kind of fingerprints or DNA?

25 A.     It has not been yet, no.

1  Q.     Okay.  Now, in your interview with my client, one

2  of the things that you talked about was that you

3  essentially talked about or threatened him with federal

4  charges since the property had gone over state lines,

5  that's interstate, do you remember saying that?

6  A.     I -- probably, I don't remember it specifically,

7  no.

8  Q.     And do you remember ever saying that if he

9  cooperates, that he will remain -- it will remain just a

10  state case in Oklahoma?

11  A.     I believe I told him that I would not submit

12  contact through federal prosecutors in Tulsa who I

13  normally work with and try to have them pick up the case.

14  Q.     And it's your statement that the -- the

15  sheriff -- that the trailer and the four-wheeler were

16  picked up by Mr. Gunn and his son-in-law, is that

17  correct?

18  A.     That's what I've been told by Mr. Gunn and

19  Mr. Fontes.

20  Q.     Okay.  Do you know whether or not there was any

21  other trailers that were taken to Oklahoma by Mr. Fontes

22  to Mr. Gunn?

23  A.     Yes, I do.

24  Q.     Okay.  And what -- what can you tell us about

25  this?

```
 1        MR. HART:  Your Honor, I'm going to object as to
 2  relevance because additional trailers which might relate
 3  to other charges are not the subject matter of the
 4  petition.
 5        THE COURT:  Sustained.
 6  BY MR. HENRY:
 7  Q.    Do you have any evidence of my client taking
 8  property to the state of Oklahoma.
 9  A.    No.  Not that I recall, no, sir.
10  Q.    So if other trailers did go to Oklahoma, that
11  would have been by Mr. Fontes?
12  A.    I have no idea.
13  Q.    Okay.  Did you have a chance to interview
14  Mr. Fontes after that day?
15  A.    Yes, I did.
16  Q.    And what day was that?  How many days later?
17  A.    Three, four, five, it was just prior to
18  Mr. Lowmaster's interview.  Probably two minutes after I
19  concluded Mr. Fontes' interview I interviewed
20  Mr. Lowmaster.
21  Q.    So the same day?
22  A.    Yes, sir.
23  Q.    And what did Mr. Fontes tell you at that point in
24  time?
25  A.    He maintained his innocence.  He did further state
```

```
 1  that he was aware of the items Mr. Lowmaster was bringing
 2  him were stolen and that he was basically brokering
 3  stolen property sales but he claimed all -- no knowledge
 4  of where they were stolen from or that he stole them or
 5  had any part in that.
 6  Q.      Have you learned that that statement was not
 7  correct or was a lie by Mr. Fontes?
 8  A.      I haven't learned that, I believe that.
 9  Q.      Okay.  So you believe that Mr. Fontes was actually
10  stealing the property?
11  A.      It was my opinion both of them were probably
12  involved in it.
13  Q.      The -- but would you agree that Mr. Fontes was not
14  being honest in his interview with you?
15  A.      I don't think so.
16  Q.      You don't think he was being honest?
17  A.      No, sir.
18  Q.      Okay.  And with respect to -- so the only -- the
19  only matters with regards to -- that you have knowledge
20  of is with -- is with respect to the trailer and
21  four-wheeler from the John Stone Ranch, is that correct?
22  A.      That's the only criminal matter in this that I
23  have any authority over of any -- anything to do with.
24  Q.      Okay.  There -- does Mr. Gunn live in Osage
25  County?
```

1  A.    No, he does not.

2  Q.    Okay.  So that's Washington County, is that

3  correct?

4  A.    That's correct.

5  Q.    And the Washington County authorities are the ones

6  who retrieved the property?

7  A.    That's correct.

8  Q.    Okay.

9        MR. HENRY:  I have nothing further of this

10 witness, Your Honor.

11       THE COURT:  Redirect, Mr. Hart?

12       MR. HART:  Um, Mr. --

13                  REDIRECT EXAMINATION

14 BY MR. HART:

15 Q.    Investigator Hunter, defense counsel asked you

16 about whether or not there was a threat about federal

17 charges and would it be more accurate to say that you

18 indicated not a threat to Mr. Lowmaster but that you

19 would not be referring your investigation to federal

20 authorities there in Tulsa?

21 A.    That's correct.

22 Q.    Accurate to say that interstate transportation of

23 a stolen vehicle would be a violation of either 18 U.S.C.

24 Section 2312 or 2313?

25 A.    Yes.

1  Q.      And to this date, have you referred or contacted

2  charges to the USAO, the U.S. Attorney's Office in

3  Oklahoma?

4  A.      I have not.

5  Q.      Instead you presented your case to a state judge?

6  A.      I presented it to the District Court of Osage

7  County.

8  Q.      Okay.  Thank you, sir.

9          I don't have any further questions.

10         THE COURT:  Recross?

11         MR. HENRY:  Nothing further.

12         THE COURT:  You may step down.  Thank you.

13         Call your next witness.

14         MR. HART:  All right.  Your Honor, we call

15  Cherryvale Chief of Police, Jimmy Holts.

16         MS. MERSEAL:  Do you prefer to swear or affirm?

17         Do you swear the testimony which you're about to

18  give in this case now in hearing will be the truth, whole

19  truth and nothing but the truth, so help you God?

20         Thank you.  Please have a seat in the witness

21  stand.

22                      JIMMY HOLTS,

23  called as a witness on behalf of the Plaintiff, having

24  been first duly sworn, testified as follows:

25                  DIRECT EXAMINATION

BY MR. HART:

Q.     Good afternoon, sir.  Would you please introduce

yourself to the court.

A.     Jimmy Holt, Cherryvale Police Chief.

       THE COURT:  Okay.  Thank you.

BY MR. HART:

Q.     And, Chief Holt, did you get involved in an

investigation that related to a property that was taken

from Rick Housel there in Cherryvale?

A.     Yes, I did.

Q.     And is that -- I guess did the report from

Mr. Housel come in on December 11th of 2017?

A.     I believe so.

Q.     All right.  And as far as the -- when the report

comes in, do you recall what property was reported by

Mr. Housel as being missing?

A.     He come into the office and stated he had a plasma

cutter and some checks that were missing from his

business in Cherryvale.

Q.     All right.  And these checks, I want to focus on

these checks.

       MR. HART:  And, Your Honor, just to alert the

court and counsel to where I am, this is now going back

to the first part of the petition, that's contained I

guess Page 1, 2, 3, 4 and ends on Page 5, and we'll be

focussing on the check-related conduct in that case.

BY MR. HART:

Q.     Those checks that Mr. Housel reported missing, were these outdated checks or checks that were no longer being used by his business?

A.     That would be correct, it was on a closed account.

Q.     And to your knowledge, how -- approximately how many checks had been passed -- unauthorized checks had been passed from the missing checks?

A.     I believe there was four attempts.

Q.     And as far as those attempts go, how many did you connect to Mr. Lowmaster?

A.     Out of those four, two.

Q.     All right.  And where were those -- I want to break those two down.

       I want to have you explain where they happened, and then how you connected them to Mr. Lowmaster.  So let's talk about -- pick one and let's talk about which one, where it happened.

A.     I guess we'll start out with Caney, that's the first place I went to.

Q.     Okay.  And is that Caney, Kansas?

A.     Yes, it is.

Q.     And what happened in Caney, Kansas relative to the missing check?

1  A.      Um, Mr. Housel come into my office, stated that he

2  got a -- alerted that a check was passed on this account

3  at the Community National Bank in Caney, Kansas.  So

4  myself and Officer Logan Waun went to Caney to

5  investigate this for a possible suspect into this

6  burglary and theft that happened at the shop there in

7  Cherryvale.

8  Q.      Now as far as the bank goes, did they have some

9  information about who attempted to present the check?

10 A.      Yes, they did.

11 Q.      What information did they have?

12 A.      They provided me a driver's license and a check

13 that was attempted passed through the other bank.

14 Q.      Did they also have any surveillance video of the,

15 I guess the attempted pass?

16 A.      Yes, they did.

17 Q.      Now, is this a check where it's actually going to

18 a teller or is this through an automated system?

19 A.      No, this was actually going into a driving teller.

20 Of the bank.

21 Q.      Okay.  So how is it -- do you know how is it that

22 it got caught?

23 A.      The clerk become -- or the teller became

24 suspicious when she was reviewing the account I guess and

25 the account was actually closed so she would not

1  authorize that -- authorizate (sic) a transaction.

2  Q.      So at that point, fair to say the teller kept the

3  ID, as well as the check?

4  A.      She made a copy of the check and the ID.

5  Q.      As far as that ID goes -- well, and this would be

6  something captured by their system, would that be fair to

7  say?

8  A.      Correct.

9  Q.      As far as that ID goes, who was it that -- who was

10 the ID of?

11 A.      Nathaniel Walters.

12 Q.      And is that an actual like Kansas driver's license

13 that was presented?

14 A.      Yes, it was.

15 Q.      Now, as far as the video footage, did it show the

16 vehicle that was being driven at that time?

17 A.      The bank had some problems with their video camera

18 systems, only image they had was a camera facing the rear

19 of the vehicle as it pulled in.  The vehicle going by

20 their system kind of looked like a silver or tannish

21 colored pickup, appeared to be like a Chevy model pickup.

22 I was unable to read the tag by their video due to the

23 graininess and how out of date the system they had.

24 Q.      All right.  Now, fair to say , did you attempt to

25 make contact with Mr. Walters?

1  A.      Yes, I did.

2  Q.      Were you successful that day?

3  A.      No, I was not.

4  Q.      All right.  Did you go then pursue the second lead

5  related to the other check?

6  A.      Yes, I was also instructed by Mr. Housel a

7  transaction did happen on the account through Walmart.

8  Upon calling Walmart I did find out was Walmart in

9  Independence, Kansas.

10 Q.      All right.  Did you roll out there?

11 A.      Yes, I went to investigate there.

12 Q.      And what did you get from Walmart as it relates to

13 that transaction?

14 A.      I got a lot of video feed, actual transaction of

15 that -- of the check with the receipt of items that were

16 used.

17 Q.      And -- okay.  And as far as the surveillance that

18 Walmart does did it actually capture pictures of the

19 person that passed the check?

20 A.      Yes, it did.

21 Q.      And is this one of those where the check is sort

22 of run automated through the machine?

23 A.      Yes, there is no signature on this check, it is an

24 automated bank draft or automated system.

25 Q.      From the surveillance were you able to identify a

1  suspect?

2  A.      Yes, I was.

3  Q.      And who was it you identified from that video

4  surveillance footage?

5  A.      Ryan Lowmaster.

6  Q.      Now, did you also from the Walmart footage, were

7  you able to see what vehicle Mr. Lowmaster went to?

8  A.      Yes, he also went to -- had a truck matching the

9  bank description that was a silverish, tannish colored

10 Chevy pickup, extended cab.

11 Q.      So you could see one picture from one store and

12 then you've already looked at the other one and you go,

13 Oh, that looks like the same one?

14 A.      Possibility of a match there.

15 Q.      All right.  Now later on, did you have an occasion

16 to interview Mr. Lowmaster relative to the check passing

17 activity?

18 A.      Yes, I did.

19 Q.      And just to be clear, is the passing of these

20 checks, would that be a crime here in the state of

21 Kansas?

22 A.      Yes, it is.

23 Q.      And, specifically, would that be the crime either

24 violation of K.S.A. 21-5821, the giving of a worthless

25 check, or 21-5823, that being forgery?

A.      Yes.

        MR. HENRY:  Your Honor, I am going to object for
the record as relevance because the violation petition
charges what the County Attorney in Montgomery County
charged, which was I believe burglary and possession of
stolen property and from my understanding, burglary no
longer stands.  After it's been through the preliminary
hearing stage.

        MR. HART:  Your Honor, the petition actually
identifies a violation that the defendant shall not
commit another federal, state or local crime and is
actually listed, these particular transactions beginning
on Page 2 and then Page 3, and then a reference to on
Page 4 to the match of the truck used in the Commercial
National Bank transaction in Walmart.

        I don't believe the petition is tied to the
charges that the -- that the Government may have pursued
at the state level, it's just whether the defendant has
committed these crimes.

        The defendant's on notice of these crimes because
they're actually listed in this petition so that's what
we're here on and that's what we have been conducting
inquiry on and I guess I would suggest -- submit to the
court that my next question might actually -- actually
relate to the theft, although I'm not sure if it relates

1  to that theft.

2          THE COURT:  Let me -- let me rule on the

3  objection.

4          MR. HART:  Sure.

5          THE COURT:  Overruled.

6  BY MR. HART:

7  Q.     As far as an additional crime related to the use

8  of the driver's license, is that also a crime?

9  A.     Yes, it is.

10 Q.     Would that be a violation of K.S.A. 21-6107, that

11 being identity theft or identity fraud?

12 A.     Yes.

13 Q.     Now, as it relates, where I left off with you is

14 did you have an occasion to talk with Mr. Lowmaster about

15 these activities?

16 A.     Yes, I did.

17 Q.     And was that a interview conducted in Montgomery

18 County?

19 A.     Yes, it was.

20 Q.     And were you after Investigator Hunter?

21 A.     I couldn't tell you where the -- where I started

22 and where he started on the -- who interviewed who first.

23 It was a long day that day.

24 Q.     All right.  But did the interview, was that

25 recorded?

1   A.      Yes, it was.

2   Q.      Was the -- was the defendant given a *Miranda*

3   warning?

4   A.      Yes, he was.

5   Q.      And in fact does the *Miranda* interview -- well, I

6   guess does the interview begin with your colleague asking

7   Mr. Lowmaster if he's familiar with his rights?

8   A.      Yes, it did.

9   Q.      And what did Mr. Lowmaster respond?

10  A.      He started repeating his rights.

11  Q.      Now, did you then go ahead and still go ahead and

12  go through his rights with him and make sure he

13  understood them?

14  A.      I did not but the other officer in the room did.

15  Q.      And did he indicate his agreement to speak with

16  you?

17  A.      Yes.

18  Q.      And what did he tell you about the check passing

19  activity at either Walmart or Independence at the Walmart

20  in Independence or at the Community Bank in Caney?

21  A.      He admitted to both places.

22  Q.      Now, did he tell you how he came into -- into

23  possession of those checks?

24  A.      Yes, he did.

25  Q.      And how is that?

1  A.      He said he got them from the Rick Fontes there in

2  Caney.

3  Q.      All right.

4          MR. HART:  Thank you, sir.  I don't have any

5  further --

6  BY MR. HART:

7  Q.      Oh, is the person that you interviewed that day,

8  is he present here in the courtroom?

9  A.      Yes, he is.

10 Q.      And who is he?

11 A.      Mr. Lowmaster, Ryan Lowmaster.

12 Q.      All right.  And you just gestured to the

13 individual at counsel's table.

14         MR. HART:  Thank you, sir, I don't have any

15 further questions for you.

16         THE COURT:  You can step down.

17         Oh, no, there could be some cross examination.

18                      CROSS EXAMINATION

19 BY MR. HENRY:

20 Q.      Chief Holt, is this the same interview that Deputy

21 Hunter that was involved in that was here just now

22 testifying before you?

23 A.      No, there was two separate interviews.

24 Q.      Okay.  What -- which interview -- was yours at the

25 Montgomery County Jail?

```
 1  A.      Montgomery County Sheriff's Office.

 2  Q.      Sheriff's office.  And what date did that occur

 3  on?

 4  A.      I believe it was the 12th.

 5  Q.      December 12th?

 6          MR. HART:  Counsel, it's number two on the disk

 7  that we provided.

 8          MR. HENRY:  Okay.

 9  BY MR. HENRY:

10  Q.      The -- in your interview with him did my client

11  ever admit to committing the burglary or stealing checks

12  from Mr. Housel's property?

13  A.      No, he did not.

14  Q.      The -- was -- who else was in the interview room

15  with you?

16  A.      Detective Chris Williams.

17  Q.      And he is with?

18  A.      Montgomery County Sheriff's office.

19  Q.      Sheriff's office?  Okay.

20          The -- the other two checks that you were not able

21  to connect to my client, were you able to connect them

22  with anyone?

23  A.      No, I was not.

24  Q.      Did your investigation come to any conclusion as

25  far as who may have stolen the checks?
```

1  A.      The only thing I come to the conclusion on was the

2  possession of the checks.

3  Q.      Okay.  And that is the case as presently pending

4  in Montgomery County District Court?

5  A.      Yes, it is.

6  Q.      And is that the one that is misdemeanor possession

7  of stolen property?

8  A.      I have no idea on which charge that would be.

9  Q.      Okay.

10  A.      My understanding there's quite a few of charges.

11  Q.      Now, you arrested my client, correct?

12  A.      Yes.

13  Q.      Was that at his home?

14  A.      No.  Well, yes, it was.  In his driveway.

15  Q.      Okay.  Now that's outside your jurisdiction,

16  correct?

17  A.      Correct.

18  Q.      And what authority did you have to do that?

19  A.      Well, I don't know if I'd call it arrest, I

20  detained him there.  I did get the permission from the

21  Montgomery County Sheriff's Department to make that

22  detain for questioning.

23  Q.      Didn't you actually take him to the ground?

24  A.      Well, no, I didn't actually, he kind of went --

25  Q.      Did someone else do it?

```
1  A.      No.

2  Q.      He landed on the ground though?

3  A.      Yeah.

4  Q.      How'd he get there?

5  A.      Well, he started -- when I asked him if he would

6  come in for question voluntarily, he would not come in

7  question voluntarily.  I felt after reviewing the Walmart

8  videos and the other video at Caney I felt like I had

9  enough to detain Mr. Lowmaster for questioning.

10 Q.      But the Walmart's in Independence?

11 A.      Yes.

12 Q.      And that's outside your jurisdiction as well?

13 A.      Correct.

14 Q.      And, again, the Caney check was separate from the

15 Walmart check?

16 A.      Correct.

17 Q.      And the -- and you admitted that you don't have

18 evidence that my client was involved in any burglary

19 stealing those checks?

20 A.      I felt like he had enough to detain him at that

21 time.

22 Q.      This pickup truck is actually black, isn't that

23 correct?

24 A.      No.

25 Q.      It's not?
```

```
1    A.      No.

2    Q.      The -- did you execute a search warrant on my

3    client's property?

4    A.      Yes, I did.

5    Q.      And who else was with you during the execution of

6    the search?

7    A.      One of my officers, Officer Logan Waun, there were

8    some deputies from Montgomery County Sheriff's Department

9    there, um, I know one of them was Deputy Williams, I'd

10   have to refer back to my list and see who all was there.

11   Q.      Was this your warrant or was this the sheriff's

12   office's warrant?

13   A.      This was my warrant.

14   Q.      Okay.  And you went to the Montgomery County judge

15   and got the signature?

16   A.      Yes, sir, I did.

17   Q.      Do you remember which judge that was?

18   A.      I believe it was going to be Gettler but I would

19   not quote me on which judge that was.  That's the one we

20   use most commonly for Cherryvale.

21   Q.      And the items you were looking for were items

22   of -- that would be what we would common say -- commonly

23   know as just identification documents, correct?

24   A.      I was looking for the checks, yes.

25   Q.      Okay.  Checks, but also were you looking for like
```

```
1   false driver's license?

2   A.      Yes.

3   Q.      Social Security cards, a number of other paper

4   documents --

5   A.      Right.

6   Q.      -- essentially?  Something that would deal

7   with -- with fraud type offenses?

8   A.      Particularly the IDs, yes.

9   Q.      And did you find any false IDs or checks during

10  the search of his property?

11  A.      No, I did not.

12  Q.      Did you ever do a search of Rick Fontes' property?

13  A.      There was a search warrant there but I was not

14  involved in that one.

15  Q.      Okay.  The -- even though your search warrant was

16  for paper documents, you ended up retrieving items that

17  were not requested in the search warrant, correct?

18  A.      Yes, these couple items were, that matched the

19  receipt that was used at Walmart.

20  Q.      Okay.  And what are those items?

21  A.      There was some makeup kits that were bought.

22  Q.      And we're talking about like makeup for one's

23  face?

24  A.      Yes.

25  Q.      Okay.  The -- was there other items taken from his
```

1  property that were not on the list as well?

2  A.      Not that I took, no.

3  Q.      Okay.  Were -- how about the sheriff's officers?

4  A.      I believe there was some stuff taken but I think

5  it was consensual by the other landowners there.

6  Q.      Okay, what are those?

7  A.      I don't know on that one for sure.

8  Q.      Okay.  What are those items?

9  A.      I don't know.

10  Q.      Is it true that the bank teller in Caney couldn't

11  identify the person that was in the truck?

12  A.      No.

13  Q.      That's not true?

14  A.      She couldn't identify -- oh, the photo seemed to

15  almost match the person in the truck but she couldn't

16  tell if it was another person or not.

17  Q.      Okay.  And did you ever get around to interviewing

18  this Nathaniel -- which was his last name?  Walters?  Did

19  you ever get to interview?

20  A.      No, and they were actually in the vehicle, I did

21  talk to him on the phone.

22  Q.      Okay.  What did he say?

23  A.      He never did use his -- his -- he knew it was

24  stolen out of his car awhile back, um, or a spare ID or

25  something, I -- he had indicated he did not use that down

 1  there in Community National Bank.

 2  Q.      Now, Caney is in Montgomery County, correct?

 3  A.      Yes, sir.

 4  Q.      And the -- are you familiar with the -- the name

 5  of Rick Fontes?

 6  A.      Wasn't up to that day.

 7  Q.      Okay.  You were -- were you aware of the -- that

 8  my client has been in a relationship with his ex-wife or

 9  wife for a number of years?

10  A.      Didn't know that until after all this took place.

11  Q.      Okay.  So, did the -- in your investigation, did

12  the Rick Fontes issues ever come into play?

13  A.      Yes, they did.

14  Q.      Okay.  And how so?

15  A.      Um, when I decided to go down to Caney, I stopped

16  by the police station there to kind of let them know I

17  was in their city, that I was going to go talk to the

18  bank there and I was talking with the chief, telling him

19  what I had going on and one of the items that were stolen

20  from Rick Housel's shop was a plasma cutter and I told

21  him kind of the general description that I had.

22          He goes, they're in my search warrant, I found

23  something that -- or a plasma cutter there.  He goes,

24  Mr. Fontes' wife's been pretty cooperative with us, she

25  may let you back in to take a look at that.

Q.      Okay.  So one of the pieces of stolen property
from Mr. Hassle's shop or storage shed there on his
property there in Montgomery County included this plasma
cutter?

A.      Yes.

Q.      And that was found in Rick Fontes' shop?

A.      Yes.

Q.      Okay.  Now, Rick Fontes' shop is separate from
where Rick Fontes lives, correct?

A.      Yes, I'm not that familiar with Caney so I
couldn't tell you the distances, differences.

Q.      Did you become aware that Rick Fontes had also had
a tractor from his residence, a stolen trailer and truck
from the city of Independence?

A.      I knew the investigators were investigating some
tractors and trailers and stuff but I didn't involve
myself with their investigation, that's up to --

Q.      But you -- when you went out to Mr. Fontes, did
you go to his shop or to his home to get permission or
consent?

A.      Um, Chief Wade down there contacted Mr. Fontes'
wife and she met us at the shop.

Q.      Okay.  So you didn't actually go to the house, you
actually went to the shop?

A.      That's correct.

```
 1  Q.      And the shop is in Caney?

 2  A.      Yes, it is.

 3  Q.      Okay.  And how far -- you're familiar with

 4  Montgomery County, correct?

 5  A.      Yeah.

 6  Q.      And you actually arrested my client in his

 7  driveway of his home?

 8  A.      Yes.

 9  Q.      What -- what distance between Caney and

10  Mr. Fontes' house or his shop there in Caney to where my

11  client lives in Montgomery County?

12  A.      I'd say Caney's, what?  24 miles from

13  Independence, going down U.S. 75.  And Mr. Lowmaster's

14  residence is approximately I'd say about four miles

15  outside of Independence on the other direction.

16  Q.      So about 27 miles?

17  A.      Approximately.

18  Q.      Okay.  And the only thing that you found in the

19  search warrant of my client's place was some makeup kits

20  from you believed to be from Walmart, and that's

21  something that he acknowledged here when you interviewed

22  him?

23  A.      Yes.

24  Q.      Okay.  But as far as large trailers with stolen

25  dump trucks or whatever?
```

1  A.    I'm not familiar with any of those.

2  Q.    Okay.  The -- okay.

3       Now, you were -- you were not the chief back when

4  this investigation was going on, is that correct?

5  A.    Yes, I was, I just become chief shortly.

6  Q.    Okay.  Now wasn't Chief Lamberts the previous

7  chief, wasn't his name on the search warrant?

8  A.    If it was it was done by mistake but, no, not that

9  I'm aware of.

10  Q.    He was already -- he had already left his position

11  there?

12  A.    Yes.

13  Q.    Is that correct?

14  A.    That would be correct.

15  Q.    Was he forced out?

16  A.    No.  He resigned.

17  Q.    Okay.  And, again, when you arrested my client in

18  his property -- on his property, in his driveway, did you

19  actually draw your weapons or did you and your other

20  officer draw his weapon?

21  A.    No, we didn't.

22  Q.    Okay.  Who was the other officer?

23  A.    Officer Logan Waun.

24  Q.    Was the pickup truck in the Caney bank, was that

25  ever able to be identified by the -- the camera at the

1  bank with respect to the license plate?

2  A.      No, it was -- the tag was not eligible (sic) or

3  was not able to be read through their camera system.

4  Q.      And how about on the Walmart videos that you're

5  able to see?

6  A.      No, that truck was too far out.

7  Q.      So the teller can't identify the person who tried

8  to pass that check, and the Walmart videos don't

9  necessarily connect that particular truck from Caney bank

10 to the Walmart?

11 A.      They were similar in style and color.

12 Q.      Okay.  And by "style" what do you mean?

13 A.      They were both Chevy -- they both appeared to be

14 Chevy pickups.  Both appeared to be extended cab models.

15 Both appeared to be the same color.  Neither one of them

16 had any, that I could ever see, any after market add-ons

17 that I could see making anything different.

18 Q.      Isn't the vehicle of choice in Montgomery County a

19 pickup truck, more so than other vehicles?

20 A.      I don't know if I'd call it a more so or not,

21 they're pretty much equal I'd say.

22 Q.      So they are pretty prevalent?

23 A.      Yeah, they're --

24 Q.      I mean?

25 A.      -- there's quite a few pickup trucks in Montgomery

1  County.

2  Q.      I mean, there's a reason why there are VIN numbers

3  on cars to specifically identify them as that particular

4  car, correct?

5  A.      Yeah.

6  Q.      And the same with respect to license plates, try

7  to identify a certain vehicle with that certain plate,

8  correct?

9  A.      Yes.

10 Q.      Okay.  And you would agree that there are hundreds

11 if not thousands of pickup trucks in Montgomery County?

12 A.      There's quite a few, I couldn't even begin to put

13 a number on that.

14 Q.      Okay.  Do you recall on any of the videos that you

15 viewed at the Caney bank or at the Walmart, whether or

16 not any of that -- the pickup trucks in those two videos

17 had any damage to its body?

18 A.      From the Caney bank I was not able to, only thing

19 I was able to see was the rear portion of that and not

20 that I could see damaged there.

21         On the Walmart video the -- I seen the -- I want

22 to say passenger side of the vehicle and it was pretty

23 far ways out in the parking lot, I didn't notice any

24 damage off either -- off the videos there.

25 Q.      Okay.  So the -- okay.  The -- so when you're

1 saying that you saw the -- the -- did you actually see

2 the individuals walk to that vehicle?

3 A.    No.

4 Q.    Okay.  So the -- the video that you're seeing of

5 this truck is from the passenger side from some distance

6 that you could not tell if there was any damage to the

7 vehicle?

8 A.    I couldn't see any damage from that -- from that

9 distance, no.

10 Q.    Okay.  And are you saying then that also you were

11 not able to connect that vehicle with the two people in

12 the Walmart passing that check?

13 A.    Yes, that's the two people that walked out or -- I

14 don't know if it was two people or one person walking

15 out, I don't remember on that one.

16 Q.    Okay.  Did you actually see them get into that

17 vehicle?

18 A.    I seen them walk towards that vehicle and the way

19 the frames are it kind of jumps two or three or a second

20 it seems like, you have quite a bit of a -- it's not

21 smooth.

22 Q.    Time lapse?

23 A.    It's not a smooth transaction of the video.

24 Q.    Okay.  So you don't have video of those two

25 individuals getting into the truck?

```
 1  A.      No, you see those individuals walk out into that
 2  general area, then that time frame jumps, you see that
 3  truck leaving approximately the same time.  No other
 4  vehicles.
 5  Q.      Can you tell how many people are in the vehicles?
 6  A.      No, I cannot, too far out.
 7          MR. HENRY:  I have nothing further of this
 8  witness.
 9          THE COURT:  You may step down.
10          MR. HART:  Your Honor, I actually had like two
11  things to clarify.
12          THE COURT:  Yeah, I've heard enough.
13          MR. HART:  You've heard enough?
14          THE COURT:  Yeah, I've heard enough really.  Okay.
15  Thank you.
16          You may step down.
17          Counsel submitting this?
18          MR. HART:  I think it's fairly clear, Your Honor.
19          THE COURT:  All right.  Based on the information
20  that's been provided through testimony I do find just the
21  testimony that reveals Mr. Lowmaster's statements himself
22  even despite the investigative findings that there's
23  problem cause to believe that the claimed violations
24  occurred so I am going to make that finding.
25          Do you desire to have a detention hearing?
```

1      MR. HENRY:  Yes, Your Honor, we would ask that we

2  proceed by proffer.

3      THE COURT:  Okay.  All right.

4      MR. HENRY:  Your Honor, present in the courtroom

5  are my client's significant other, Crystal Britton, and

6  her mother, Mrs. Muller.  If my client is released that's

7  where he used to live at prior to release in December.

8  He has been essentially the supporting parent to

9  Crystal's children that she had with -- through her

10 relationship with Mr. Fontes, the person who is

11 the -- from Deputy Hunter's own testimony, was trying to

12 put it on my client but was not very believable.

13      They don't have any criminal -- my client's

14 significant other and her mother have no criminal history

15 or drug history, it's a good home to go back to.

16      The -- the -- I would point out that when he

17 first -- when Mr. Lowmaster was first represented in this

18 case he was allowed to self surrender on his case.  I

19 don't believe that he -- and I -- and I apologize, he did

20 not -- I do not have his pretrial services report or have

21 reviewed it because it would have been from years ago in

22 his 2014 case, but the -- I don't believe that there's

23 any failures to appear in his past.

24      I confirmed up, I called Koehn Properties and

25 Koehn Properties are out of actually I think Olathe or

1  Overland Park, and one of the owners is Jim Wright or

2  managers of those properties and those include -- because

3  I ended up actually talking -- I called Mr. Wright, he

4  gave the number, my return number to Tristan Lofton, he

5  is the maintenance man in Independence, Kansas for the

6  property of Pheasant Point in Independence, for

7  the -- these are apartment complexes, for the 8th and

8  Main Street apartments in Independence, for the Gold Dust

9  historic residence in Fredonia, and then there's also a

10 fourth one, Woodson historic residence in Yates Center.

11 He is the maintenance man, he said of approximately 140

12 units that he ends up taking care of.

13      If my client were released he said he would most

14 definitely hire him.  He, first of all, said that there

15 was a -- a job opening for another maintenance, full-time

16 maintenance person there for Koehn Properties, these four

17 apartment complexes.  But he also said that he

18 would -- my client owns his own company of Lowmaster

19 Heating and Air, and he said that he would most

20 definitely use him because that's -- these -- these

21 apartment complexes have used him in the past.  He said

22 that he does a lot better -- he said he does a lot better

23 job and he does it cheaper than the vendors that they're

24 using right now and that they would definitely hire him

25 back.  And so the -- he has a job waiting, either his

1 self employment or the possibility of even taking that

2 other maintenance position job with Koehn Properties out

3 of Kansas City area who own those apartments.

4     The -- as I mentioned, I think he was allowed to

5 self surrender on his first sentence, I don't think

6 flight risk is the issue, pretty much has lived in

7 the -- in the Independence area most of his life. He has

8 a good job, support here in the courtroom for him and a

9 good place to go back to.

10     He has been in custody for approximately the last

11 six months on cases that only went to preliminary hearing

12 in first in April and then were finalized I think they

13 had to actually continue the matter, they were finalized

14 in early May for a preliminary hearing that he's been in

15 custody on.

16     The -- so I would submit that the -- there is

17 conditions that the Court can set even if it is also with

18 an electronic monitoring. The -- one of the things that

19 has come up from the testimony is whether or not my

20 client will travel to Oklahoma. The court can certainly

21 limit that to just Montgomery County or the surrounding

22 counties in Kansas, in Southeast Kansas and then also

23 including travel to Wichita to meet with his counsel, or

24 also to obviously show up for court. But I think that

25 the court can set conditions of release for him.

 1         He has, again, he's been separated from his family

 2  for some time and wants to rejoin them if at all

 3  possible.  We acknowledge that there is the Oklahoma case

 4  that he believes that he will be able to make bond on.

 5         And has what would appear to be a theft case, I'm

 6  not for sure the Oklahoma statutes that the Government

 7  was referring to and I don't know if those match up with

 8  what exactly the Osage County authorities charged since

 9  that may not be, you know, like the Government was asking

10  the witness and what the charges were by the county

11  attorney in Montgomery County doesn't know either.

12         THE COURT:  Now where would he live in Montgomery

13  County?

14         MR. HENRY:  He would live with Crystal Britton and

15  her mother, Ms. Muller, who are here in the courtroom

16  behind me in the second row and that is just outside of

17  Independence, about four miles outside of Independence.

18  Chief Holt mentioned it's four miles approximately on the

19  other side of -- of Independence from where Caney is at.

20  And that's where he would reside.

21         Again, he -- he would not have any objection to

22  being on electronic monitoring.  He would remain within

23  the state of Kansas.  From -- from what I gathered, if he

24  went back and was able to obtain employment right away

25  with, as we anticipate either through his self employment

1 company or with the Koehn, and that's K-o-e-h-n

2 Properties, he'd work either in Independence, Fredonia or

3 Yates Center, which are all in that surrounding area.

4 Fredonia is Wilson county; Yates Center is Woodson

5 County; I know Allen County is around there; and then of

6 course Independence is Montgomery County but he would

7 essentially work in the surrounding counties around

8 Independence.

9       He would live in the Independence area out in the

10 country where he lives with his family here today and so

11 and again, the cases are from -- these are not crimes of

12 violence, Your Honor, these are -- the allegations are

13 theft cases, essentially from Oklahoma or from Kansas and

14 his underlying case was felon in possession of a firearm

15 and so we would ask that the Court, even though the

16 Court's found probable cause to go forward with the final

17 hearing, we would ask that the court impose conditions of

18 release and at this time I am not aware of any final

19 hearing date.

20       THE COURT: Okay. All right.

21       Mr. Hart.

22       MR. HART: Your Honor , it is the defendant's

23 burden on a supervised release violation to show by clear

24 and convincing evidence that the person will not flee or

25 pose a danger to any other person or the community and in

1  this case the defendant pose -- proposes that he is going

2  to reside with Ms. Britton as his placement.  Ms. Britton

3  would have been his placement at the time he committed

4  these crimes while he was on supervision.

5       What is interesting to me is the defendant's

6  questions, which introduced the defendant's questions to

7  Chief Holt actually introduced a fact that I'm not sure

8  has actually been presented by Chief Holt, that there

9  were two individuals at Walmart and that two individuals

10  walked out.  And irrespective of whether that is in fact

11  the case, the fact that the defendant has suggested that,

12  as his question would suggest, that there was a second

13  person present during the past and the fact that there is

14  makeup being purchased would suggest that Ms. Britton

15  might actually be involved in these criminal activities.

16       I think Ms. Britton is a very poor placement and

17  based upon what you have, she would be a very poor

18  placement for Mr. Lowmaster and I don't think the defense

19  presents clear and convincing evidence to the contrary.

20       I would note I am intimately familiar with the

21  history of this case, the original case, because this

22  case came into our system in a very unusual way.  Way

23  back in the day, Mr. Lowmaster was looking at no less

24  than five state cases in Montgomery County and in Labette

25  County, and was looking at roughly eight years of prison

1  time.

2         His attorney, Mr. John Gillett, contacted the U.S.

3  Attorney's Office because they were done dealing with him

4  down there and they were just going to send him to

5  prison.  Mr. Gillett contacted our office to see if we,

6  the U.S. Attorney's Office, could convince the locals to

7  allow Mr. Lowmaster to face federal charges and allow him

8  the opportunity to work those charges off by providing

9  information about other criminal activity and,

10  specifically, a double homicide that Mr. Lowmaster had

11  claimed he had information on.

12         So we managed to convince the locals to allow

13  Mr. Lowmaster to come into our system.  He was facing two

14  felon in possession charges and the felon in possession

15  charges relate to him breaking into someone's property

16  and stealing firearms and in one case, if my memory

17  serves it was no less than 21 firearms that were stolen

18  from a particular landowner and -- and in support of that

19  I would note that the restitution that he owes is some

20  $11,000 based upon the number of firearms that were

21  stolen.  Not all of which were recovered.

22         Now, Mr. Lowmaster did do work at that point in

23  time and his charges ultimately, it -- one was vacated

24  and we worked with him in that regard.  He was sentenced

25  to I believe 30 months by Judge Melgren with 36 months of

supervision based upon the Government's motion.  That was

a significant departure at that time because his

guideline range with the other count present was around

200 -- if my memory serves around 264 months because his

criminal history category was that bad.

So, by virtue of the reduction in charges, the

number of charges, his guideline range was ten years,

Judge Melgren gave him 30 months, which is roughly

two-and-a-half years at that time.  He then gets out on

supervision and we have within a year a return to similar

conduct, which is stealing other people's property, and

doing it now in different locations, one involving

crossing state lines into Oklahoma.

What I would note for the court is we had

presented information relative to two cases, two

different criminal investigations, one in Oklahoma and

one out of Cherryvale.  There is, in fact, two other

cases that are currently pending in Montgomery County

related to other matters.  One has proceeded to

preliminary hearing, the defendant has been bound over on

that case.  Another proceeded to preliminary hearing but

that was bifurcated so that they could get some value on

that issue or on the property and then reopen that,

present that.

Neither one of those were alleged in the violation

1  reports and I'm not referencing them to add allegations

2  because we've already done the detention or the

3  preliminary hearing, but I would submit to the Court that

4  the defendant has essentially engaged in a similar return

5  to conduct that has already been shown in at least two

6  other cases where probable cause has been shown and now

7  he is facing, as Dale Hunter advised, a warrant out of

8  Oklahoma.

9       I think the defendant presents a unique danger to

10 the community because if he is let out, despite the fact

11 that he lives in Montgomery County, and he's been there

12 forever, he will continue to commit crimes, stealing and

13 thieving and selling property and essentially, um, not

14 simply being a nuisance, but creating a whole, like,

15 career of just not listening to court and when they say

16 don't take other people's stuff, which is things we

17 learned as five year olds not to do and Mr. Lowmaster

18 just seemingly can't help himself from doing this.

19      So, Your Honor, I appreciate that it's not very

20 serious crimes with which he's charged but his criminal

21 history indicates that this is precisely the type of

22 conduct that he has engaged in a lifelong history, the

23 reason why he came to us is because he was trying to

24 escape the state convictions for very similar conduct and

25 now once he's here, he's just got right back to it and so

1  I guess from my perspective it is time for Mr. Lowmaster

2  to pay the piper and that we need to keep him in custody

3  so that he doesn't add additional cases for any state

4  jurisdiction, or federal jurisdiction for that matter.

5       That would be the Government's position.  I don't

6  believe the defense has met their burden.

7       THE COURT:  Okay.  Give you the last word,

8  Mr. Henry.

9       MR. HENRY:  Your Honor, the overzealous response

10 by the Government shows that it overreaches at times as

11 well to accuse my client's significant other in the

12 courtroom in her presence here when the videos of my

13 client's interview regarding the Walmart matters

14 specifically say that that person that is with him is

15 Rachel Thompson is -- would be, I would submit,

16 the -- the statements were just incorrect and, again, I

17 think it is a good home to go back to and I don't think

18 it is -- does any service to anyone to start accusing

19 family members of committing things when the evidence

20 that has been provided me by the Government would reflect

21 that it was somebody entirely different.

22      And , again, from my understanding, Crystal

23 Britton has no criminal history and nor does her mother

24 and they would be a good place to go home to.

25      Thank you.

THE COURT:  All right.  As the burden has been
stated by the Government that it is your burden,
Mr. Lowmaster, to show by clear and convincing evidence
that you're not a flight risk, that you won't flee, and
that you're not a danger to the community and so based
upon the information that I have listened to and
received, I don't believe that -- I don't think that I
can find that you will flee.  I'm not clearly convinced
that if you were released that would you flee.

But the Government brings up a, you know, a very
unique argument with regard to the danger that you pose
to the community by taking people's stuff and so I -- I
would have thought, um, that you having gone to federal
prison, that once released, you know, this would -- you
wouldn't go back, you know, you wouldn't want to go back
so, um, I am struggling with -- with whether or not, you
know, I'm clearly convinced that you are a danger to the
community because I will acknowledge that the, um,
claimed violations here for which I did find probable
cause, they are not related to you being in possession of
a firearm and so I -- I do acknowledge that but I can't
help but wonder if a firearm wasn't present where you
were, whether or not, you know, that could happen but
beyond that -- and beyond that that won't happen in the
future.

1          I don't think a bracelet would keep you from

2    committing -- committing the additional crimes.  And so

3    I'm going to have to think about it.  And so I just don't

4    know.

5          So, counsel, can we pick back up tomorrow?  I need

6    to think about this.  I need to think about it.  I -- I

7    just do.  I need to think about it.

8          MR. HENRY:  Sure, Your Honor, I understand and I

9    think I am probably going to be on the court's docket on

10   Friday.  Is it possible to maybe set the matter over to

11   Friday?

12         THE COURT:  Well, I think you folks -- I think

13   Judge Gale is going to be taking over rotation --

14         MR. HENRY:  Okay.

15         THE COURT:  -- and I want to make sure that we

16   don't, you know, bog down the Marshal service.

17         MR. HENRY:  Okay.

18         MR. HART:  In terms of the timing, Your Honor,

19   what would you like?

20         THE COURT:  What do we have tomorrow?

21         Okay.  Morning.  10:00?

22         MR. HART:  I know I'm going to be occupied at

23   10:00 and 11:00.

24         THE COURT:  Okay.  9:00.

25         MR. HART:  9 o'clock is fine with me.

 1          THE COURT:  9:00, Mr. Henry?

 2          MR. HENRY:  9:00 a.m. is fine.  Thank you, Your

 3  Honor.

 4          THE COURT:  I just need to think about it

 5  Mr. Lowmaster, because, you know, the -- this isn't the

 6  typical danger, you know, that you see but, you know,

 7  going into people's homes and -- and exposing them to

 8  that sort of thing or going into their property and

 9  exposing them to those kinds of things is frightening and

10  can be perceived as dangerous, so I'm going to have to

11  balance that and I -- I just -- and I don't think that I

12  have enough time to do that right now.

13          And so I want -- I do want to make sure that I'm

14  fair to you by considering this and I want to make sure

15  that I'm fair to the Government so it's unfortunate that,

16  you know, your family came here and -- and I apologize

17  for that but, um, my obligation is, you know, to the

18  community and to make sure that I do the right thing and

19  I just want to think it through.

20          All right?

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  All right.

23          MR. HENRY:  Thank you, Your Honor.

24          MR. HART:  Thanks, Your Honor.

25          THE COURT:  All right.

1          MS. MERSEAL:  All rise.

2          THE COURT:  We'll be adjourned.

3          (Proceedings conclude at 4:59 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2         I, Jana L. McKinney, United States Court Reporter

 3  in and for the District of Kansas, do hereby certify:

 4         That the above and foregoing proceedings were

 5  taken by me at said time and place in stenotype;

 6         That thereafter said proceedings were transcribed

 7  under my discretion and supervision by means of

 8  transcription, and that the above and foregoing

 9  constitutes a full, true and correct transcript of

10  requested proceedings;

11         That I am a disinterested person to the said

12  action.

13         IN WITNESS WHEREOF, I hereto set my hand on this,

14  the 5th day of July, 2018.

15

16              s/ Jana L. McKinney
                Jana L. McKinney, RPR, CRR, RMR
17              United States Court Reporter

18

19

20

21

22

23

24

25
```